**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



ATTORNEY FOR APPELLANT:

**W. RUSSELL SANFORD**
South Bend, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| IN RE: THE GUARDIANSHIP OF M.A.M. | ) | |
| | ) | |
| D.L.M., | ) | |
| | ) | |
| Appellant-Petitioner, | ) | |
| | ) | |
| vs. | ) | No. 71A03-1108-GU-365 |
| | ) | |
| J.G., | ) | |
| | ) | |
| Appellee-Respondent. | ) | |

APPEAL FROM THE ST. JOSEPH PROBATE COURT
The Honorable Barbara J. Johnston, Special Judge
Cause No. 71J01-0604-GU-62

**March 8, 2012**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**KIRSCH, Judge**

D.L.M. ("Father") appeals from the trial court's order denying his petition to terminate a permanent guardianship of M.A.M. ("the Child") entered in favor of J.G. ("Maternal Grandfather"). Although Father presents several issues for our review, the dispositive issue in this appeal follows: Whether the trial court erred in denying Father's petition to terminate Maternal Grandfather's guardianship of the Child.

We reverse and remand.

### FACTS AND PROCEDURAL HISTORY

Father and C.L.G. are the biological parents of the Child, who was born out of wedlock on January 27, 1999. Father established paternity of the Child in 2000 and was granted custody of the Child that same year. C.L.G.'s parental rights as to the Child were terminated in 2001.

Father has been employed by the South Bend Community School Corporation for more than fourteen years and teaches business. Father is also a Lieutenant Colonel in the Indiana National Guard and has been deployed overseas three times: (1) from January 2004 to July 2006; (2) from May 2007 to November 2008; and (3) from July 2009 to July 2010. Father relied on friends and family members to care for the Child during the periods of deployment. During one of the periods of deployment, Father met his wife ("Wife") and she began living with Father and the Child in January of 2007. Father and Wife were married in May 2007.

Wife and the Child traveled to Bosnia to visit with Wife's family there. Shortly thereafter, Father joined Wife and the Child in Slovakia for his deployment there. The three behaved as a family in all respects, and the Child attended school while abroad. The Child

was allowed and encouraged to have communication with Maternal Grandfather and his family by telephone, email, and mail. When Father, Wife, and the Child returned to South Bend, they continued to act as a family, and the Child was able to see Maternal Grandfather and his family frequently.

In April 2009, when Father learned of his third deployment, Father delayed telling the Child until the end of the school year in order to avoid upsetting her. Father, Wife, and the Child discussed with the Child whether she would accompany Father and Wife to Bosnia, stay in Indianapolis with her paternal aunt ("Paternal Aunt"), or stay with Maternal Grandfather. The Child expressed a strong desire to stay with Maternal Grandfather, and Father acceded to her wishes. Father then met with Maternal Grandfather to arrange for the Child to reside there and to discuss Father's wishes to see the Child at Christmas. Father provided Maternal Grandfather with a signed power of attorney form and $1,000, which was to be used to pay the Child's expenses, prepaid school lunches for the year, in addition to other items.

After his deployment, Father and the Child maintained contact via email. When Father learned that he would be unable to take leave at Christmas so that he, Wife, and the Child could celebrate the holiday in Sarajevo together, he made alternate plans for the Child to travel to Bosnia for Easter, and for her to spend time with Father's family in Indianapolis at Christmas. The Child was reluctant to go to Indianapolis for Christmas and Maternal Grandfather supported her decision not to do as Father had wanted. Father persisted in his position that the Child visit with his family at Christmas, and the Child continued to resist. Ultimately, the Child did not visit Father's family at Christmas and did not travel to Bosnia

for Easter.

Father was aware that his sister ("Paternal Aunt") used a belt to discipline her own children. Father disapproved of the use of a belt for discipline, and has never used such discipline with the Child, instead using time-outs, spanking, and consequence/reward punishments as appropriate. Father has communicated his position with Paternal Aunt. Father does not believe that Paternal Aunt is an abuser. Rather he disagrees with her on the use of the belt for discipline. During Father's deployment from 2004 to 2006, the Child resided with Paternal Aunt and allegations were made that the Child was physically and emotionally abused while living there.

Father was disappointed with the Child's failure to spend time with his family at Christmas and failure to travel to Bosnia for Easter. He also was displeased with the Child's use of make-up and change in hair style. Father then prepared and signed a new power of attorney which provided for the appointment of Maternal Grandfather and Paternal Aunt. Maternal Grandfather filed for and obtained a temporary guardianship of the Child in January 2010. Father claimed that he did not receive notice of the hearing on Maternal Grandfather's petition. Maternal Grandfather filed a petition for permanent guardianship of the Child, which was granted on March 16, 2010. Father acknowledged receiving an email from Maternal Grandfather's attorney about the hearing on the petition scheduled for March 16, 2010, and replied that he did not consent to the petition for permanent guardianship as he believed the power of attorney in place at the time was sufficient until he returned from his deployment.

After the trial court granted Maternal Grandfather's petition for permanent guardianship, Maternal Grandfather sent an email to Father informing him that Maternal Grandfather was now the Child's parent and that Father should not expect to pick up the Child upon his return to South Bend. Father was both surprised and upset by the contents of the email. Upon Father's return to South Bend on July 3, 2010 with Wife and their new son, he saw the Child the next day at a pool party. The Child was appreciative of gifts offered to her, but did not greet Father warmly. Since that time, Father's visits with the Child have been supervised or with a therapist.

Father sought a termination of the permanent guardianship because he has observed a downward slide in the Child's behavior toward him and others, and a lack of discipline in her life. A social worker, who testified at one of the hearings in this matter, stated that she believed that the Child needed to reconcile with Father, but that the goal would have to be accomplished over time. Ultimately, the trial court denied Father's petition. The trial court did not rule on Father's motion to correct error or motion for certification. Father now appeals.

## DISCUSSION AND DECISION

As an initial matter, we note that Maternal Grandfather has failed to file a brief in this appeal. When the appellee has failed to submit a brief we need not undertake the burden of developing an argument on the appellee's behalf. *Trinity Homes, LLC v. Fang*, 848 N.E.2d 1065, 1068 (Ind. 2006). Instead, we will reverse the trial court's judgment if the appellant's brief presents a case of *prima facie* error. *Id*. *Prima facie* error is defined as, at first sight, on

5

first appearance, or on the face of it. *Id.* Where an appellant has failed to meet this burden, we will affirm. *Id.*

Father argues that the trial court erred by denying his motion to terminate the permanent guardianship that had been granted to Maternal Grandfather as to the Child. The trial court issued findings of fact and conclusions thereon in denying Father's motion. All findings and orders of the trial court in guardianship proceedings are within the trial court's discretion. Ind. Code § 29-3-2-4. We review those findings issued by the trial court under an abuse of discretion standard. *E.N. ex rel. Nesbitt v. Rising Sun--Ohio County Cmty. School Corp.*, 720 N.E.2d 447, 450 (Ind. Ct. App. 1999).

In making our determination whether the trial court abused its discretion, we look to the trial court's findings of fact and conclusions thereon. *Id.* The findings will not be set aside unless clearly erroneous. *Id.* Findings of fact are clearly erroneous when the record lacks any facts or reasonable inferences to support them. *DeHaan v. DeHaan*, 572 N.E.2d 1315, 1320 (Ind. Ct. App. 1991). Because of the two-tiered standard of review applicable in this situation, we will not set aside the judgment unless we find it clearly erroneous. *E.N. ex rel. Nesbitt*, 720 N.E.2d at 450. A judgment is clearly erroneous when it is unsupported by the findings of fact and conclusions thereon. *DeHaan*, 572 N.E.2d at 1320. Further, a judgment can be clearly erroneous if it relies on an incorrect legal standard. *Menard, Inc. v. Dage--MTI, Inc.*, 726 N.E.2d 1206, 1210 (Ind. 2000).

We give due regard to the trial court's ability to assess the credibility of witnesses. *Id.* While we defer substantially to findings of fact, we do not do so to conclusions of law. *Id.* "We do not reweigh the evidence; rather we consider the evidence most favorable to the

6

judgment with all reasonable inferences drawn in favor of the judgment." *In re Guardianship of J.K.*, 862 N.E.2d 686, 691 (Ind. Ct. App. 2007).

"Indiana law has long recognized that 'natural parents are entitled to the custody of their minor children, except when they are unsuitable persons to be entrusted with their care, control, and education.'" *In re Guardianship of B.H.*, 770 N.E.2d 283, 285 (Ind. 2002) (quoting *Gilmore v. Kitson*, 165 Ind. 402, 406, 74 N.E. 1083, 1084 (1905); *see also* Ind. Code § 29-3-3-3, -6)). Our supreme court went on to state that "[u]nless otherwise determined in a dissolution decree or in another proceeding authorized by law, a surviving parent has the right to custody of minor children." *In re Guardianship of B.H.*, 770 N.E.2d at 285 (citing Ind. Code § 29-3-3-3). In the context of disputed custody claims "the interest of the child is the paramount consideration," but "we can not conceive that it should be invoked or enforced against a parent under no disabilities, unless he has forfeited his right by misconduct, or lost it by voluntary relinquishment or by long acquiescence in the care and custody of his child by another." *Id.* (quoting *Gilmore*, 165 Ind. at 407, 74 N.E. at 1084). Parents "have a constitutionally recognized fundamental right to control the upbringing, education, and religious training of their children." *Schwartz v. Schwartz*, 720 N.E.2d 1219, 1222 (Ind. Ct. App. 1999). "In a proceeding to determine whether to place a child with a person other than the natural parent, evidence establishing the natural parent's unfitness or acquiescence, or demonstrating that a strong emotional bond has formed between the child and the third person, would of course be important, but the trial court is not limited to these criteria." *In re Guardianship of B.H.*, 770 N.E.2d at 287.

Here, there is no evidence that Father was an unfit parent, had abandoned the Child, or acquiesced to a transfer of her custody. Instead, the record reveals that Father made every attempt to provide for the Child's needs and in some instances acceded to her wishes, even if that meant a period of separation from her while he was deployed. Father attempted to communicate with Maternal Grandfather about his wishes for the Child, i.e., visitation with himself and extended family members, make-up and hair styles, etc. However, Maternal Grandfather, while possessing the power of attorney granted by Father, refused to support Father and his efforts to parent the Child, and instead yielded to the Child's wishes. Father objected to Maternal Grandfather's petitions for temporary and permanent guardianships, arguing that the power of attorney he had put in place while he was deployed would suffice until his return. While we acknowledge and commend the trial court's efforts to mitigate the disruptions in the Child's life and to facilitate the transition back into Father's custody, Father's constitutional rights as a parent mandate the immediate return of his Child to his custody.

Father has established *prima facie* error. We further conclude that the trial court erred by denying Father's petition to terminate the permanent guardianship. We reverse the order of the trial court and remand the matter for the entry of an order consistent with our opinion.

Reversed and remanded.

BARNES, J., and BRADFORD, J., concur.

8