Mindy HINKLEY, Appellant–Respondent,

v.

Erinn Elizabeth CHAPMAN and Bradley Warren Chapman, Appellees–Petitioners.

No. 76A04–0403–CV–125.

Court of Appeals of Indiana.

Nov. 30, 2004.

---

John M. Haecker, Grimm & Grimm, Auburn, IN, Attorney for Appellant.

Christopher J. Wheeler, Stout, Wheeler & Zabona, LLP, Angola, IN, Attorney for Appellees.

## OPINION

SULLIVAN, Judge.

Mindy Hinkley appeals the trial court's order granting Erinn and Bradley Chapman's petition for permanent guardianship over Hinkley's son, L.B.

We affirm.

## FACTS AND PROCEDURAL HISTORY

L.B. was born on November 8, 1993 to Mindy Hinkley. L.B. has resided with Hinkley since birth[1] and has been home schooled by her since kindergarten. In June 2002, L.B. was diagnosed with a speech impediment, i.e., an articulation disorder, which makes him difficult to understand.

When L.B. was nine years old, Hinkley's adult daughter and L.B.'s half-sister Erinn Chapman became concerned that L.B. was unable to communicate effectively and was not receiving an adequate education. As a result, on August 12, 2003, Chapman and her husband filed a petition seeking temporary and permanent guardianship over L.B. The trial court set a hearing on the petition for temporary guardianship and appointed a guardian ad litem. Following a hearing on October 14, 2003, the trial court denied the petition for temporary guardianship. However, the court ordered L.B. to undergo a psychological evaluation in preparation for the hearing on the petition for permanent guardianship.

On January 15, 2004, the trial court held a hearing on the petition for permanent guardianship. A written psychological evaluation had been prepared by licensed clinical psychologist Dr. David Lombard and filed with the court. In his evaluation, Dr. Lombard reported that he had administered an achievement and an intelligence test to L.B. on November 21, 2003. The achievement test revealed that L.B. was functioning on a "kindergarten level" for reading and spelling and a "first grade level" for mathematics. Appellant's Appendix at 17. The result of the intelligence test indicated that L.B.'s "general intellec-

tual abilities" were below average. Appellant's App. at 17. However, Dr. Lombard noted a discrepancy in L.B.'s "perceptual reasoning subtests," which assess ability to learn, and his "verbal comprehension subtests," which assess learned information. Appellant's App. at 17–18. In particular, Dr. Lombard noted that while L.B.'s abilities for verbal comprehension were below average, his abilities for perceptional reasoning were average. Based upon these results, Dr. Lombard concluded that L.B. is "an individual with an average intellectual ability who simply [has not been] taught the information that would be appropriate for [his] age." Appellant's App. at 18. To rectify L.B.'s educational deficiency, Dr. Lombard recommended that L.B. undergo "aggressive professional educational intervention." Appellant's App. at 18.

The appointed guardian ad litem, who had reviewed the psychological evaluation, as well as other information, testified that because of L.B.'s educational deficiency it was in his best interests to be placed with the Chapmans. The guardian ad litem further testified that in his opinion, the Chapmans, who loved L.B. and had a relationship with him, "would be very careful to attend to his educational needs." Transcript at 153. After taking the matter under advisement, the trial court concluded that the Chapmans should be appointed co-guardians over L.B.

## DISCUSSION AND DECISION

Hinkley contends that the trial court erred by granting the Chapmans' petition for permanent guardianship over L.B. The guardianship statute provides for the appointment of guardians for minors.[2] *See* Ind.Code § 29–3–5–1(a) (Burns Code Ed.

1. L.B.'s biological father is deceased.

2. As defined by statute, a minor is "an individual who is less than eighteen (18) years of

age and who is not an emancipated minor." Ind.Code § 29–3–1–10 (Burns Code Ed. Repl. 2000).

Repl.2000) ("Any person may file a petition for the appointment of a person to serve as guardian for an incapacitated person or minor...."). However, before a court is required to appoint a guardian for a minor, a court must find that the appointment is "necessary as a means of providing care and supervision of the physical person or property of the ... minor." Ind.Code § 29–3–5–3(a)(2) (Burns Code Ed. Repl. 2000).

■ Hinkley's contention upon appeal is two-fold. She first contends that the trial court failed to enter a finding that the appointment of a guardian for L.B. was necessary. Hinkley also contends that even assuming the trial court implicitly found that the appointment was necessary, that finding was erroneous because the trial court "had other less invasive means to address its concerns about [L.B.'s] education...." Appellant's Brief at 9. We address each contention in turn.

■ As Hinkley contends, the guardianship statute requires a trial court to find that the appointment of a guardian is necessary to provide care and supervision of a minor. I.C. § 29–3–5–3(a)(2). Necessary means "[a]bsolutely essential" or "[n]eeded to achieve a certain result or effect." *E.N. ex rel. Nesbitt v. Rising Sun–Ohio County Community School Corp.*, 720 N.E.2d 447, 452 (Ind.Ct.App.1999), *trans. denied.* However, a trial court's failure to include a specific finding on necessity will not be grounds for reversal if it is implicit in the trial court's evidentiary findings. *Id.*

In this case, the trial court did not specifically find that the appointment of a guardian for L.B. was necessary. Nevertheless, the trial court entered extensive findings in support of its conclusion that the appointment was in L.B.'s best interests, a standard implicit within subsection (a) of the guardianship statute. *Id.* at 451. For instance, the trial court found that

L.B., although ten years old, was reading at a first grade level and performing mathematics at a third grade level. The trial court further found that L.B.'s educational deficiencies were not the result of a mental impairment, which thwarted his ability to learn, but inadequate home-schooling, which deprived him of the opportunity to learn. Implicit in these findings is the trial court's finding that the appointment of the Chapmans as guardians was necessary, i.e., absolutely essential or needed to rectify L.B.'s educational deficiencies. Therefore, we do not reverse the trial court's determination for the absence of a specific finding.

■ Hinkley also contends that the trial court erroneously concluded that the appointment was necessary. According to Hinkley, the appointment was not necessary because the court had "less invasive means to address its concerns about [L.B.'s] education." Appellant's Brief at 9. In particular, Hinkley contends that the trial court could have ordered her to either "continue [L.B.'s] private tutoring or to enroll [L.B.] in a public or private school." Appellant's Brief at 10. In support of her contention, Hinkley relies upon this court's holding in *E.N.*, *supra*, in which this court reversed a guardianship because the appointment was not necessary, and Indiana Code § 29–3–5–3(c)(2), which allows a trial court to enter an "appropriate order" if it determines appointment of a guardian is not in a minor's best interests. We find neither argument persuasive.

Initially we note that our holding in *E.N.* does not stand for the proposition that a guardianship becomes unnecessary because a trial court has less intrusive means to address a parent's deficiency in educating her child. In *E.N.*, the trial court granted a school system's request for a limited guardianship for the purpose of

making educational decisions for a student whose parent refused to aid the school system in implementing an educational program for the student. 720 N.E.2d at 450. We reversed the trial court's decision upon appeal because we concluded that the guardianship, while it would have made the school system's task of completing the educational program easier, was not essential. *Id.* at 452–53. We explained that the school system had means, other than the parent's cooperation, to accomplish its task. *Id.* Thus, the appointment of the guardian in *E.N.* was deemed not necessary, not because the trial court could have ordered the mother to comply with the school system's requests, but because the party seeking the guardianship had sufficient means to accomplish the task on its own.[3]

Hinkley's reliance upon I.C. § 29–3–5–3(c)(2) is also misplaced. In relevant part, Section 3 provides as follows:

"(a) Except under subsection (c), if it is alleged and the court finds that:

(1) the individual for whom the guardian is sought is an incapacitated person or a minor; and

(2) the appointment of a guardian is necessary as a means of providing care and supervision of the physical person or property of the incapacitated person or minor;

the court shall appoint a guardian under this chapter.

* * *

(c) If the court finds that it is not in the best interests of the incapacitated person or minor to appoint a guardian, the court may:

(1) treat the petition as one for a protective order and proceed accordingly;

(2) enter any other appropriate order; or

(3) dismiss the proceedings."

Hinkley focuses upon subsection (c)(2) in an effort to persuade this court that when a trial court has an opportunity to enter an appropriate order which would obviate the need for the guardianship, it must do so.

However, subsection (c) does not contain any language specifically requiring a trial court to consider less intrusive actions prior to appointing a guardian. *See Ind. Dept. of Public Welfare v. Guardianship of McIntyre*, 471 N.E.2d 6, 9 (Ind.Ct.App. 1984) (requiring clear and unambiguous statutory language to be given its plain meaning). Indeed, this court has previously observed that a trial court's powers under subsection (c) are discretionary. *See E.N.*, 720 N.E.2d at 451 (observing that subsection (c) outlines "permissible actions a court may take"). Finally and more important, the interplay between subsections (a) and (c) suggests that it is the best interests standard which determines whether a trial court has authority to act under subsection (c). *Id.* That is, under subsection (a) a trial court must find, not only that the appointment of a guardian is necessary, but that it is in the

---

**3.** Even were we to apply the holding in *E.N.*, it would not require reversal in this case. Unlike the school system in *E.N.*, the Chapmans do not have legal authority to address the need sought to be addressed by the guardianship. As L.B.'s sole custodial parent, Hinkley had the right to direct L.B.'s education. *See Hampton v. State*, 754 N.E.2d 1037, 1041 (Ind.Ct.App.2001) (stating that only custodial parent has right to make educational decisions for child), *trans. denied*. Therefore, without first being appointed guardians, the Chapmans would have been unable to take steps to correct L.B.'s educational deficiencies. *See* Ind.Code § 29–3–8–1(a) (Burns Code Ed. Repl.2000) ("The guardian of a minor (other than a temporary guardian) has all of the responsibilities and authority of a parent....").

minor's best interests. Thus, it is conceivable that a trial court might find the appointment of a guardian to be necessary, but not in the best interests of the minor. When this occurs, a trial court may then consider other options under subsection (c). However, a trial court is not required to consider less intrusive means before it finds the appointment is necessary.

■■■ Finally, to the extent Hinkley challenges the trial court's ultimate decision to appoint a guardian, she has not shown that the trial court abused its discretion. A third party seeking guardianship over a minor must overcome the strong presumption that a child's best interests are served by remaining with the natural parent with clear and convincing evidence showing that the child's best interests are substantially and significantly served by placement with the third party. *In re Guardianship of B.H.*, 770 N.E.2d 283, 287 (Ind.2002), *reh'g denied*.[4] "This determination falls within the sound discretion of our trial courts, and their judgments must be afforded deferential review." *Id.*

■■■ Because a trial court is required to enter findings, we will reverse the trial court's judgment when there is no evidence to support the findings or the findings do not support the judgment. *Id.* Upon appeal, we consider only the evidence favorable to the judgment. *Id.* "[A]n appellate court may not impose its own view as to whether the evidence is clear and convincing but must determine, by considering only the probative evidence and reasonable inferences supporting the judgment and without weighing evidence or assessing witness credibility, whether a reasonable trier of fact could conclude that the judgment was established by clear and convincing evidence." *Id.* at 288.

Here, the trial court found that L.B., although ten years old, was reading at a first grade level and performing mathematics at a third grade level. The trial court also found, citing the psychological evaluation, that L.B.'s developmental lag was not the result of a learning disability, but Hinkley's failure to educate him using age-appropriate materials.[5] The trial

---

**4.** The right of a natural parent to direct her child's education is part of the presumption that it is in the child's best interests to remain with the natural parent. *See In re Guardianship of B.H.*, 770 N.E.2d at 287. Therefore, appointment of a guardian in a third party does not, contrary to Hinkley's assertions, improperly infringe upon her parental rights. Additionally, a guardianship does not permanently sever parental rights and may be terminated if found to be no longer necessary. *See* Ind.Code § 29–3–12–1(c)(4) (Burns Code Ed. Repl.2000).

**5.** In her reply brief, Hinkley takes issue with Dr. Lombard's psychological evaluation, which states that L.B. "had not been educated on the material that would be appropriate for a child in the fifth grade." Appellant's App. at 18. In particular, Hinkley contends that, by law, L.B. only could have been in the fourth grade when Dr. Lombard prepared his report in December 2003.

The law in effect at the time provided that a child must be at least five years old by June 1 to enter kindergarten for the school year. *See* I.C. § 20–8.1–3–17(e) (Burns Code Ed. Supp. 2004) (subsequently amended by P.L. 291–2001, Section 111, effective May 11, 2001, to require a child to be at least age five by July 1 for the 2001–02 school year and any subsequent school year). As L.B. was born November 8, 1993, he would have been permitted to enter kindergarten during the 1999–2000 school year and would have been in the fourth grade during the 2003–2004 school year as Hinkley suggests.

While the trial court cited the portion of Dr. Lombard's evaluation, which indicated that L.B. had not been educated with materials appropriate for a child in the fifth grade, the court's emphasis was on L.B.'s developmental lag and not a particular number of years. In particular, the court found that L.B. "through no fault of his own, [was] several years behind his peers." Appellant's App. at 9. This con-

court further found that Hinkley's recent attempts to seek help for L.B. were driven by the Chapmans' decision to intervene and that Hinkley's intention to enroll L.B. in public school in the future was insincere. The trial court also found that the Chapmans have "legitimate concern for [L.B.]" [6] Appellant's App. at 10. Based upon these facts, the trial court concluded that the Chapmans had met their burden. Without reweighing the evidence or judging witness credibility, we conclude that the trial court could have concluded that the judg-

ment was established by clear and convincing evidence. Therefore, the trial court did not abuse its discretion in appointing the Chapmans as guardians.

The judgment is affirmed.

NAJAM, J., and BARNES, J., concur.

clusion is supported by evidence that L.B. was reading at a first grade level and performing mathematics at a third grade level. As L.B.'s developmental lag was the basis for the trial court's conclusion, we find no error.

6. Hinkley claims that the Chapmans failed "to direct this Court to evidence in the record establishing the nature of any personal relationship between [themselves] and [L.B.] and that they can communicate with [L.B.]." Appellant's Reply Brief at 2. Our Supreme Court has stated that evidence demonstrating "a strong emotional bond" between a child and a third party may be important in determining whether to place a child with someone other than the natural parent. *In re Guard-ianship of B.H.*, 770 N.E.2d at 287. However, a strong emotional bond is only one factor to consider. *Id.* In any event, the trial court did find that the Chapmans had "legitimate concern" for L.B. Appellant's App. at 10. This finding is supported by the guardian ad litem's testimony that he believed the Chapmans loved L.B. and had a relationship with him. Finally, any difficulties the Chapmans may have in communicating with L.B. is due to L.B.'s articulation disorder, which L.B.'s speech therapist testified makes him difficult to understand fifty percent of the time. However, L.B.'s inability to communicate well would not preclude but favor the Chapmans' appointment as guardians.